Case number 23-3735 Kayla Ayers v. Ohio Dept of Rehabilitation and Correction, arguments not to exceed 15 minutes per side. Mr. Howe, you may proceed for the appellant. Good morning. May it please the court, my name is Brian Howe, and with the Ohio Innocence Project, I represent Appellant Kayla Ayers. I've requested to reserve four minutes for rebuttal. Ms. Ayers' trial attorneys failed her in a case that turned on expert arson conclusions. They did nothing to investigate or research those issues prior to trial, and as a result, they allowed false expert testimony to be presented to the jury as irrefutable proof of her guilt. Now, the case as it stands today is presented to this court on a narrow issue of timing, and specifically pursuant to section 2244D1D, when could the factual predicate for her ineffective assistance of counsel claim have been discovered through the exercise of due diligence, reasonable diligence? There's no question that the claim was filed within one year of the discovery of the Lantini Report, which is the report that found the flaws in Inspector Winter's testimony to begin with, and specifically the two points of origin conclusion. And so the question actually becomes whether Ms. Ayers could have discovered either this report or a similar expert review of Winter's testimony earlier than she did through the exercise of reasonable diligence, and the answer is no for two reasons. First, she had no reason to look for it. There was nothing in the trial record that would have put any reasonable person on notice that there was an error at all in Winter's testimony. And second, even if Ms. Ayers thought that she had an obligation to conduct her own forensic expert arson review from prison, she had no means to do so. She had no means to hire an expert. Getting an expert review was outside of her control completely. When does she, and I don't know if the record reflects this, when does she reach out to the Innocence Project? That is not in the record, and actually it's not relevant for purposes of 2244D, and I'll explain why. She was in prison, yes. And this was something that the district court raised, is that there's nothing in the record about when she reached out to the Ohio Innocence Project or when she might have reached out to other nonprofits. In fact, this goes towards the second point, is that assuming that she is going to get pro bono assistance of some kind can't be part of a reasonable diligence analysis. She's simply not entitled to it. It's like buying a lottery ticket. At that point, the same reasoning would support a question of why she didn't start a GoFundMe account to raise money for an expert, or why she didn't reach out to local philanthropists for money. She was not entitled to assistance from anyone. In fact, she could not compel a third party to obtain the expert review. She was not entitled to state funds for an expert review, and she does not have the education or background to conduct this review herself. So if you hypothetically had a rich, well-educated person under the same circumstances, would they be required to exercise due diligence more promptly to find an expert? Well, yes. And I think, to be clear, I'm not suggesting that Ms. Ayers doesn't have an obligation to exercise due diligence. She does. The means within her ability to gain certain information is determined by her indigency. And so if a wealthy person knew that there could be a claim out here for ineffective assistance of counsel, and decided, well, you know, now is not the right time for me to really start digging into this issue, then I think that would be an issue of reasonable diligence. That's not this case. In this case, and this Court has said in the Duchenne Zee, we have to take into account the realities of the prison system, that we have to take into account Ms. Ayers' specific circumstances. She had no means to compel an expert to review this case. And she had no means to compel the Ohio Innocence Project. In a case where that information is entirely outside of a person's control, this Court's characterized it as sort of a fortuitous discovery. And this is like the evidence in the Iggy case, the letter undermining the credibility of the state's bite mark testimony in that case. The Court recognized that's outside of the petitioner's ability to sort of command the production of that piece of information, and therefore its discovery is fortuitous. It's not something that that petitioner failed to produce in a timely way as a result of their failure of reasonable diligence. There's even a sort of antecedent point to this, is that in order to have discovered this expert report, she has to know that there's even a problem in the trial court to begin with. And this is another issue that the district court and respondent have raised, is that, well, what was she doing in the sort of first three or four years after her conviction, in between having been convicted and obtaining the report? And the fact is, there was no reason for her to have been doing anything to pursue this claim at all, because there was nothing in the record that would have hinted to any reasonably diligent layperson that there were flaws in Inspector Winter's testimony. This is not like the Stokes case, for example, where we have a glaring error that's apparent from the record, or some sort of fundamentally flawed methodology of sort of junk forensics more generally. We're, in this case, dealing with technically sound methodologies that are being misapplied, misused, to very specific facts from this specific crime scene. This is not the kind of thing that you're going to read about in the newspaper and be able to apply to this testimony. You're saying technically sound methodologies. I thought in various parts of the briefing you call it junk science. It is junk science as applied to this case. Now, we're not asserting that it is impossible for an arson investigator ever to determine the point of origin of a fire. I think it's reasonable to assume under certain circumstances they can. What is junk science is, in this case, Inspector Winter's claims that the evidence as it appears at the crime scene here indicated two points of origin. That is what Mr. Lentini found was junk science. That was completely unsupported by the methodologies that should have actually been used there. To be clear, yes, we're not attacking the underlying methodology for being able to determine a point of origin in certain circumstances. But it's especially true in this case that Ms. Ayers would not have been put on notice because her trial counsel themselves did nothing to contest this information at trial. So from Ms. Ayers' perspective, in order for her to have pursued this claim or thought that she should pursue this claim, she would have not only had to assume without evidence that Inspector Winter's conclusions were wrong, but she would also have to assume that her trial attorney was wrong in not challenging those conclusions. And she would have had to do that as a 23-year-old person with a 10th grade education. That is not reasonable diligence. That is not what should be expected of a person in her circumstances. And, in fact, applying that rule across state prisoners, as the respondent is requesting, would require every state prisoner with unchallenged forensic testimony that was submitted in their case to, as soon as they get to prison, they have to start researching, assuming that it's false, assuming that their trial counsel did nothing to challenge or contest that. That is not reasonable diligence. That is closer to the sort of maximum possible diligence that this court very specifically said was not required in the Dicenzi opinion. And, finally, I think there is a question that or a different sort of lens through which we could look at this case that I think clarifies issues for me, and that is to ask what Ms. Ayers could have done differently, specifically. If this is a matter of reasonable diligence, and I understand that Ms. Ayers has the burden to show reasonable diligence, but if this is something that she could have attained with reasonable diligence, it should be fairly straightforward to say, here's step one, step two, step three, and step four is an expert review of Inspector Winter's opinion. No one has done that in this case ever. And the reason that they haven't is because you cannot do it. There is no reasonable pathway for Ms. Ayers through diligence to obtain an expert review starting from the trial record. So did she reach out to the Ohio Innocence Project? Is that in the record? I believe that it is in the record that she reached out to the Ohio Innocence Project, yes. So I'm sure the state is going to say that she could have reached out right away when she went to jail. So what changed in the course of the time? Well, you know, I mean, so again, first of all, she had no idea that this specific claim existed. I mean, she may have known that she was innocent, but she had no reason to believe that there was a specific issue with Inspector Winter's testimony. And furthermore, What caused her then to, a few years later, realize this? It's not in the record whether she just didn't know of the Ohio Innocence Project earlier or, you know. It's not in the record. I'm not asking for info that's not in the record. That's correct. It's not in the record, and frankly, it doesn't need to be in the record because the facts are sufficient as they are to support her diligence under 2244D. What is in the record is that she had no arson training. She was indigent. She could not hire an expert. No reasonably diligent person would have been put on notice that this claim existed even until you get the actual expert review. And now after that point, of course, she has to be diligent. She has one year from that point. Her lack of legal training doesn't matter. If the Ohio Innocence Project decides that they're not going to represent her, she has an obligation to raise that information from John Lantini herself in a pro se petition. But she did do that. Within nine months of that petition, she had filed these claims. Within nine months of the Lantini report, she had filed these claims in state court. Within one year, she had filed a protected petition through the federal courts. The fact is, and I don't know that Ms. Ayers would agree, but she is fortunate. She's actually lucky to have gotten an expert opinion at all under these circumstances. Almost zero state prisoners will be able to obtain an expert review of forensic testimony in their trial without funds themselves to do so. This is a kind of fortuitous discovery described in the EG case. So we ask the court to reverse the trial court's decision dismissing the case on timeliness grounds and remand for further proceedings. Thank you. Good morning, Your Honors. Catherine Mullen on behalf of the Director of the Ohio Department of Rehabilitation and Correction. We're asking this court to affirm the decision of the district court denying and dismissing this petition as untimely. The question, I think, before this court was properly phrased by my opposing counsel, which is we're looking here at reasonable diligence on behalf of Ms. Ayers, but the focus needs to remain on Ms. Ayers. There's attempts here to deflect Ms. Ayers' responsibility onto, well, my trial counsel didn't do something or maybe appellate counsel didn't do something. But we know from the law from this court that what we're looking at is her burden to show diligence. I mean, she's in jail. I think the record does reflect that she retained the Innocence Project while she was still in jail. So what is related to reasonable diligence? What could due diligence, what else could she have done to discover essentially what Lantini says, which is, you know, that what the expert testified at trial was incorrect, didn't follow the correct procedures. What else could she have done? I think that's a great question, Your Honor. So what we know, first of all, we don't know when she reached out to the Ohio Innocence Project. I've reviewed the record. I have not seen a date where she reached out. I have seen an affidavit from, I believe, an intern at the Ohio Innocence Project that indicates that their expert Lantini reviewed materials sometime in the summer of 2019, but I don't know in terms of when she communicated with them further. I would note... She was still in jail in the summer of 2019. And she was still in jail. She was released in August of 2019. But I would note, interestingly, that if this Court looks at Ms. Ayers' motion for leave to file a motion for new trial, there is a footnote in Ms. Ayers' motion where she basically says, if you want additional information, we're going to argue that Criminal Rule 33, Ohio Criminal Rule 33, is unconstitutional because that would get into attorney work product information and otherwise privileged information. So it appears that there was a concerted decision to not provide information about who she contacted or when she contacted, and I believe that's why the record is silent as to that. Notably, in terms... Why does this matter if the Lantini report was not produced or was not created as a report until a particular date? Well, that matters, Your Honor, because the Lantini report does not provide the factual predicate in this case. So there's cases from this Court, including Stokes, and I believe I cited a recent case from January of this year, Deaton. I might be saying that incorrectly. D-E-A-T-O-N versus Hildebrand from January of this year. When we're looking at the factual predicate, it's not the expert report itself that we're concerned with. It's the material that's in it. And I think the record here clearly... How do you define factual predicate, or is that defined in the cases? Well, I tried to research it, Your Honor, and find a nice clear definition of factual predicate, and I didn't see one. I know the defense has posited one in their brief, but I think that the way they phrased it in their brief was that without this evidence, their claim would fail. But we know that that can't be the standard because in that Deaton case that I just cited, this Court specifically said discovering the factual predicate of a claim is not the same as proving a claim. So we know that the factual predicate is not dependent on proof. And we have other cases from this Court that talk about you're not considering diligence in the context of obtaining every shred of evidence that might exist to support your claim. We're looking at did you or could you have reasonably discovered the information here. And I think the most telling way that you know that she didn't need to rely on the Lantini Report is because her theory at trial was that her 3-year-old son set the fire. She says, I could see him from this viewpoint that the state presented evidence that they didn't think that she could do it, but she says my son set this fire. Well, if her son set the fire, and she saw her son set the fire, she would have absolutely known how many points of origin there were to the fire. She would have seen what he was lighting on fire. So she would have known since the time of trial, since 2013, whether or not that information was correct. Wouldn't she have seen the son, the 3-year-old, set one particular place, but might not be aware of whether, because the son was a 3-year-old with a lighter and had been shown to know how to set a lighter off? Well, potentially, Your Honor, but I think that interestingly goes into the ever-changing stories that Ms. Ayers provided to law enforcement. Because actually, if this court goes to, it's in the record at 15-1, page ID 479, she tells the officer that she actually didn't see her son set the fire. And then she changes her story at some point and says, well, maybe I fell asleep and there was a cigarette in my mouth, and the cigarette caught the mattress on fire. But we know that that's not the case, because there's no evidence of a cigarette at the scene. And Mr. Lantini does not contradict that testimony from Mr. Winters about the lack of a cigarette. We also know that she told officers, well, my son was with me by the mattress the whole time. She tells them at some point, my son was with me the whole time. But we also know that to one of the first responders, she told him, well, I was running up the stairs to get my son. So which one is it? Was he by you the whole time, or was he actually upstairs and he wasn't around? So I think when we look at the actual facts of this case, she knew, and she had reason to know. And then you can also look at her direct appeal. In her second assignment of error in her direct appeal, she says, well, my trial counsel was ineffective because they weren't prepared. They hadn't properly reviewed this discovery, and they weren't prepared to properly cross-examine Reginald Winters. Okay. So, again, you're on notice about Reginald Winters and contesting this information, and your trial counsel is ineffective assistance. And then also in 2013, which is still ‑‑ That wasn't about the points of origin, right? I think the counsel didn't realize that he had certain discovery as it related to the fire. Correct, Your Honor. The way it was raised by appellate counsel was not about the point of origin. The ineffective assistance issue was raised, and then notably Ms. Ayers did not pursue an Ohio Appellate Rule 26B application to reopen. She could have claimed her appellate counsel was effective for not raising that issue, and she didn't because, in fact, the state courts, when they've addressed this petition below, found the claim barred by res judicata because that was information that she would have had at the time and could have raised in her appeal and that it was not done. Sorry. Ms. Ayers, I believe there was a discussion earlier with my opposing counsel about the type of error that we have here. Ms. Ayers, in her appellant's brief to this court, did call ‑‑ I believe used the word obvious error and said that it was obvious for trial counsel, because of their lack of, I guess, forensic background or familiarity with arson, that it should have been obvious to them of their need to retain an expert. If it was an obvious error, then we can go and look at the Stokes case from this court, and if it was an obvious error, we know then, again, that the Lentini report cannot be the factual predicate for her claim because that was something that she could have raised at the time of her direct appeal and didn't do so. I think the other issues, this court granted a limited certificate of appealability, so the issues that are not before this court include actual innocence, equitable tolling, due process challenges. Notably, due process was one of the things that the EG opinion was more informative on. That case, really, in terms of the ineffective assistance of counsel claim, which is what this court's here to hear, that court reversed the district court's granting of relief on an ineffective assistance of counsel claim, finding that the report did not ‑‑ I'm sorry, that the letter from the Wayne County Prosecutor's Office did not satisfy the factual predicate here. I think under the facts of this case, Ayers knew, based on the claims that she presented, her theory at trial, in fact, even her defense attorney's closing argument at trial, said to the jury, asked them, can you wholeheartedly believe this double origin theory? That was in her counsel's closing argument. This is something that she knew or could have known. She filed that motion in 2013, asking for the appointment of counsel for postconviction. That was denied at the time, and in the court's order, it said it was denied because she had already been granted an attorney for appeal. She did not renew that motion. There's no evidence of any follow-up or anything else that she did for approximately a period of six years. And to sit on your hands for six years is not diligent. Anything else would completely obliviate the statute of limitations in the first place. Pending any questions, I'm prepared to rest, Your Honors. Thank you. Thank you. There's a lot to respond to, but I will do my best to get to as much as I can in the four minutes that I have remaining. Opposing counsel mentioned an Ohio 33b motion that was filed and a footnote that we would challenge the ability. This has to do with a now-defunct procedure under state law in Ohio that required the parties or a movement under 33b to justify the time between the discovery and the filing of a motion. So in other words, it was sort of an indeterminate statute of limitations. It said, well, after you learned about this, what did you do in the three months before you filed or the six months before you filed? That's now been eliminated by the Ohio Supreme Court, but we would have challenged it. It has nothing to do with this case. It has nothing to do with what Ms. Hayers did prior to learning about Valentini Report. What about this argument about the defense attorney's closing argument at trial, saying can you believe the double source? I think it's interesting that opposing counsel brings up the closing argument because, in fact, that was in the context of her trial counsel effectively conceding that Winters was testifying to a reasonable degree of scientific certainty. And the defense counsel's argument was, well, it's not absolute certainty. You know, we can't just defer the entire guilty beyond reasonable doubt standard to Inspector Winters. But there was no challenge at all to the two points of origin theory. I mean, there was zero challenge to that theory. Asking the jury, can you believe it? I mean, I think if you read the defense's closing argument, you'll see that there was nothing really effectively challenged. That's not surprising because the defense counsel had done nothing to prepare on these issues. They had done zero research on any of this. It would have been shocking if defense counsel had raised a sophisticated challenge to Inspector Winters' two points of origin theory. They'd done zero consultation on it. They themselves had no training or experience to raise this issue. In terms of the 26B argument about why she didn't file for appellate counsel, you cannot raise new evidence through a direct appeal in Ohio. That's just 100% clear. It's White v. Worden. We've cited that. We've responded to that. They cite to a portion in the heirs' merit brief that it should have been obvious to trial counsel that they needed an expert. This goes to the deficiency prong in Strickland. It should have been obvious to them. They knew that they didn't know anything about fire science, and they still decided, well, we'll wing it, I guess, at trial. That was an obvious deficiency. Now, it doesn't show prejudice. If everything that Inspector Winters said at trial had been true, the heirs would not have an ineffective assistance to counsel claim because she would not be able to prove prejudice. She would not be able to prove what would have happened had they actually consulted. And that question remained open and not obvious to any reasonable layperson until you actually have an independent expert finally review Winters' testimony. And that is the factual predicate. That is a necessary part of the claim for prejudice. In terms of the counsel's reference to the Iggy case, the important point there is not particularly that there's an IAC claim and a due process claim. The foundation for the court's decision in that case was that the IAC claim was based on the trial record, and the due process claim was based on substantive problems with the expert testimony that would not have been obvious at trial. And that is the through line between Stokes and Iggy and DeChenzey is, was this information available to the person based on the trial record? Or, as in Iggy, was this something that was fortuitously discovered, not apparent from the trial record, and something that was outside of this person's control to produce? That is the situation that we are in today, and that is sort of the common thread between those three cases. I see that I'm out of time. If the court has no further questions, thank you. Thank you both for your argument, and the case will be submitted.